J-S40018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN THE INTEREST OF: E.C., A MINOR   :   IN THE SUPERIOR COURT OF
                    :           PENNSYLVANIA
                    :
APPEAL OF: A.C., MOTHER       :
                    :
                    :
                    :
                    :
                    :   No. 1090 MDA 2025

Appeal from the Order Entered July 7, 2025
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000061-2024

IN THE INTEREST OF: L.C., A MINOR   :   IN THE SUPERIOR COURT OF
                    :           PENNSYLVANIA
                    :
APPEAL OF: A.C., MOTHER       :
                    :
                    :
                    :
                    :
                    :   No. 1091 MDA 2025

Appeal from the Order Entered July 7, 2025
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000062-2024

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY PANELLA, P.J.E.:         **FILED: FEBRUARY 3, 2026**

A.C. ("Mother") appeals from the July 7, 2025 orders changing the

permanency goals of her son, E.C., born in November of 2017, and daughter,

L.C., born in January of 2019 (collectively, "the Children"), from reunification to adoption.[1]  After careful review, we affirm.

We gather the relevant factual and procedural history from the certified record.  This family has a history of involvement with the York County Office of Children, Youth and Families ("CYF") dating back to 2018 regarding, *inter alia*, housing concerns.  **See** Orders of Adjudication and Disposition, 4/16/24, at 1.  On February 24, 2024, CYF received a report alleging that then-six-year-old E.C. was locked in a makeshift cage for extended periods of time in maternal grandmother's home, where Mother resided with the Children.[2]  **See id.**  The report also alleged that then-five-year-old L.C. was regularly left strapped in a car seat in the home that was too small for her size.  **See id.**  Finally, the report alleged that Mother neglected the Children's medical care.  **See id.**

On the day the report was received, CYF sent a caseworker to the family home.  **See id.** at 1-2.  Mother was not there, but CYF spoke with maternal grandmother, who reported that she was acting as the full-time caregiver for the Children because Mother was not consistently present to parent them.  **See id.** at 2.  At this visit on February 24, 2024, and three subsequent

---

[1] The Children's father, J.R., did not appeal the goal change and did not participate in this appeal.

[2] Mother consistently resided with maternal grandmother throughout these dependency proceedings.

unannounced visits over the following week, CYF observed E.C. locked in the makeshift cage, which consisted of two cribs stacked on top of each other, and L.C. restrained in the small car seat. ***See id.*** Although CYF explained the inappropriateness of these restraints to Mother and maternal grandmother, neither of them stopped using them. ***See id.***

During CYF's investigation, Mother admitted that the Children had not been seen by a doctor or dentist in at least four years. ***See id.*** CYF arranged for the Children to be seen by a dentist, which revealed that L.C. required "full extraction of all [] her top teeth due to extensive decay[.]" ***Id.***

On March 19, 2024, upon medical advice, CYF took the Children to the emergency room. ***See id.*** at 3. After examination, the Children were admitted to the hospital for malnutrition. ***See id.*** E.C. also had extensive bruising all over his body and "erythema to his penis and scrotum[.]" ***Id.*** at 3. The hospital expressed concern that the Children, then ages six and five, respectively, were not toilet trained and wore diapers. ***See id.***

On March 20, 2024, the Children were placed in the emergency protective custody of CYF. Following a shelter care hearing two days later, the court confirmed the Children's separate placements in foster care.

The court adjudicated the Children dependent on April 16, 2024, and maintained their foster care placements. The court established the Children's permanency goals as reunification with concurrent goals of adoption. In the order, the court found that Mother and maternal grandmother committed child

abuse against the Children pursuant to 23 Pa.C.S.A. § 6303, specifically that they "knowingly and recklessly caused the unreasonable restraint of [the Children] and caused serious physical neglect" of the Children with respect to their medical needs.[3]  Orders of Adjudication and Disposition, 4/16/24, at 4, 7.

In furtherance of reunification, Mother was ordered to, *inter alia*, complete a threat of harm assessment along with any resulting recommendations and parenting classes.  Notably, on April 16, 2024, the juvenile court did not grant Mother visitation due to a finding that it would pose a "grave" threat to the Children.  *Id.* at 7.  The court later clarified that contact of any kind between Mother and the Children was prohibited.  *See* Permanency Review Orders, 7/2/24, at 4-5.  Mother did not appeal from any of these orders.  The prohibition on contact and visitation between Mother and the Children has remained in place throughout these proceedings.

On May 17, 2024, CYF filed motions requesting the court to issue findings that aggravated circumstances exist with respect to Mother.  The juvenile court held a hearing on June 10, 2024, and granted the motions.  In addition, the court ruled that reasonable efforts to preserve and reunify the family shall not continue.  *See* Aggravated Circumstances Orders, 6/10/24, at 1-2.  ("Reasonable Efforts to Reunify: No efforts are to be made to preserve

---

[3] Mother and maternal grandmother were not criminally charged in relation to the child abuse they committed against the Children.

the family and reunify the Child[ren] with [] Mother."). Again, Mother did not appeal from these orders.

In the aggravated circumstances orders, the court found that Mother's physical abuse and neglect of the Children caused them to have "significant lower body muscle deficits," developmental delays to their speech and social skills, and "seriously impaired" functioning. Aggravated Circumstances Orders, 6/10/24, at 1. The Children required physical therapy to address their delayed "gross motor" development. Orders of Adjudication and Disposition, 4/16/24, at 5. Specifically, E.C. suffered from "lower extremity weakness" and "impaired balance," which affected his ability to walk. Order of Adjudication and Disposition (E.C.), 4/16/24, at 5. L.C. needed a "medical stroller to address her extremely limited mobility and gait for her age." Order of Adjudication and Disposition (L.C.), 4/16/24, at 5.

The juvenile court held permanency review hearings on July 2, 2024, January 14, 2025, and July 7, 2025.[4] Each of the permanency review orders from these hearings stated that "[i]t has been determined that visitation with [] Mother is contrary to the safety or well-being" of the Children. Permanency Review Orders, 7/2/24, at 4-5; Permanency Review Orders, 1/14/24, at 4; Permanency Review Orders, 7/7/25, at 4.

_____

[4] The court also held status review hearings on October 8, 2024, November 19, 2024, and April 15, 2025.

- 5 -

Despite the court's directive that CYF make no reasonable efforts toward reunification, it provided Mother with services through Catholic Charities. The permanency review orders up through and including January of 2025, revealed that Mother's compliance and progress with her objectives was minimal. On July 7, 2025, Mother's compliance and progress were rated as moderate for the first time. Mother completed the threat of harm assessment, which recommended continued support from CYF. In addition, the certified record reflects that Mother had been attending the assessment's recommended dialectical behavior therapy ("DBT") for three months. She was also attending a parenting program, but there was no evidence that she completed it.

The juvenile court held the subject permanency review hearing on July 7, 2025, by which time the Children had been in placement for fifteen months. CYF presented the testimony of the following witnesses: Suzanne Kearse, Mother's family therapist at Catholic Charities; Moira LeCount, Mother's family advocate at Catholic Charities; Destiny Michael, CYF caseworker; E.C.'s foster mother; maternal grandfather, L.C.'s kinship resource; and D.R., the Children's court-appointed special advocate ("CASA"). Mother testified on her own behalf and presented the testimony of maternal grandmother.

At the conclusion of the hearing, the juvenile court *sua sponte* ruled on the record and in open court that the Children's permanency goals will be

changed from reunification to adoption.[5]  *See* N.T., 7/7/25, at 98.  On July 7, 2025, the court entered the subject orders, which included a provision continuing the suspension of visitation and contact of any kind between Mother and the Children.  *See* Permanency Review Orders, 7/7/25, at 4.  The court also found that CYF did not have a documented compelling reason for not proceeding with petitions for the involuntary termination of Mother's parental rights.  *See id.* at 3-4.

Mother timely filed notices of appeal and contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.  The trial court filed its Rule 1925(a) opinion on August 29, 2025.

On appeal, Mother presents the following issues for our review:

1. Whether the juvenile court erred or abused its discretion in finding that reasonable efforts have been made by CYF to finalize the Children's permanency plans when there had been no efforts to discern whether the Children had suffered any trauma or should otherwise be precluded from having contact with Mother?

2. Whether the juvenile court erred in changing the goal from reunification to adoption?

3. Whether the juvenile court erred or abused its discretion in finding that there was no justification for maintaining the goal of reunification or directing CYF to proceed with a petition for involuntary termination of parental rights when Mother had

---

[5] A goal change "may occur as a result of a petition by the responsible agency or *sua sponte* by the trial court during its mandatory review of the dependency matter."  ***Interest of K.C.***, 319 A.3d 596, 600 (Pa. Super. 2024) (citation omitted).

made moderate progress toward alleviating the circumstances which necessitated the original placement?

4. Whether the juvenile court erred or committed an abuse of discretion in continuing to deny Mother visitation when there had been no evidence of trauma and only speculation?

5. Whether the juvenile court erred or abused its discretion in finding that it has been determined that visitation with Mother is contrary to the safety or well-being of the Children? Specifically, was it error or an abuse of discretion to find that there should be a no contact order, when there is no evidence of trauma or other issues to preclude such contact?

Mother's Brief at 5-6 (cleaned up; reordered for ease of disposition).

We review goal change orders for an abuse of discretion. *See K.C.*, 319 A.3d at 599 (internal citation omitted). This Court is not bound by the trial court's legal conclusions, but we must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *Id.* at 599-600. This deference has been explained, as follows:

Not only are our trial judges observing the parties during the hearing, but usually . . . they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id.* at 600.

A child's permanency goal in a dependency matter is governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-65. This Court has outlined the following

relevant legal principles for trial courts when considering changing a child's permanency goal:

> The policy underlying the [Juvenile Act] is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, ... the focus of dependency proceedings, including change of goal proceedings, [is] on the child. Safety, permanency, and well-being of the child must take precedence over **all** other considerations, including the rights of the parents.
>
> Pursuant to 42 Pa.C.S.A. § 6351(f) of the Juvenile Act, when considering ... a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. **The best interests of the child, and not the interests of the parent, must guide the trial court.**

**K.C.**, 319 A.3d at 600 (some emphasis added).

Trial courts must also consider whether "reasonable efforts were made" by the agency "to finalize the permanency plan in effect." 42 Pa.C.S.A. § 6351(f)(5.1). However, "[i]f the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to . . . preserve and reunify the family shall be made or continue to be made." 42 Pa.C.S.A. § 6351(e)(2). It is well settled that this determination is within the court's discretion. ***See In the Interest of S.U.***, 204 A.3d 949, 965 (Pa. Super. 2019).

Regarding a parent's progress, we have held that, while "parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors." **K.C.**, 319 A.3d at 600. "Ultimately, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **Id.** at 600-01 (internal punctuation marks omitted).

We address Mother's first three issues together as they are interrelated. In her first issue, Mother argues that the court abused its discretion in finding that CYF made reasonable efforts to finalize the family's permanency plan because it had not yet made a concrete plan to reintroduce the Children to Mother. **See** Mother's Brief at 31-33. In her second and third issues, Mother argues that the juvenile court abused its discretion when it changed the Children's permanency goals from reunification to adoption. **See** Mother's Brief at 18-21, 26-28. Specifically, Mother asserts that the court failed to consider "the extent of the progress" that she had made over the pendency of the case. **Id.** at 19. She blames the court's suspension of visitation with the Children for her inability to make further progress. **See id.** at 19-20, 27. We disagree.

We emphasize that when the court found aggravated circumstances existed as to Mother, it expressly provided that CYF not make reasonable efforts to reunify the Children with her. **See** Aggravated Circumstances

Orders, 6/10/24, at 1-2. The record clearly shows that the juvenile court was acting appropriately to protect the children and provide them with stability to resolve the numerous issues created by Mother. Mother's first issue fails for this reason. To the extent that CYF nonetheless provided services to Mother,[6] and Mother started to comply by the time of the July 7, 2025 permanency hearing, we discern no abuse of discretion by the court changing the Children's permanency goals.

Contrary to Mother's bald assertion, the court explicitly stated that it considered the "entirety" of Mother's compliance and progress with her objectives. Juvenile Court Opinion, 7/7/25, at 7-8. The court recognized that Mother was participating, but failed to complete, DBT therapy and a parenting course. *See* Permanency Review Orders, 7/7/25, at 1-2; *see also* Status Review Orders, 4/15/25, at 2.

To the extent that Mother acknowledges her lack of progress in satisfying her objectives, she contends that it is due to the court's suspension of her visitation from the outset of the case. Further, Mother argues that the suspension was unjustified, as discussed further *infra*. We disagree inasmuch as Mother continued to demonstrate a lack of accountability for the Children's

___

[6] The record does not reveal why CYF graciously continued to provide reunification services to Mother, nor why the court allowed such services to continue after its order for no reasonable efforts to be made.

placements. *See* N.T., 7/7/25, at 70 (Mother testified, "I don't feel like I was being the monster I was made to sound like.").

Moreover, Ms. Michael testified that Mother continued to reside with maternal grandmother and that it "doesn't seem like there is any intention to separate[.]" N.T., 7/7/25, at 65. Ms. LeCount similarly testified that Mother did not have any plans to live independently from maternal grandmother. *See id.* at 38. This was of concern due to maternal grandmother's participation in the Children's abuse and neglect, along with the conclusion from the threat of harm evaluation that maternal grandmother is not an appropriate parenting support for Mother. *See* Permanency Review Orders, 1/14/25, at 5.

The record is clear that the Children's best interests are served by a goal change to adoption. As described above, the court found that Mother's abuse and neglect significantly impacted the Children's physical, emotional, and mental development. *See* Aggravated Circumstances Orders, 6/10/24, at 1. Since being removed from Mother's care, the Children have improved overall in their physical and emotional well-being. For example, E.C. is finally toilet trained. *See* N.T., 7/7/25, at 47. He attends physical, occupational, speech, and play therapy, and has a one-on-one support teacher in summer camp to assist with his behaviors. *See id.* at 39, 41-42; Permanency Review Order (E.C.), 1/14/25, at 2. According to L.C.'s kinship provider, she successfully completed physical and speech therapy and will complete occupational therapy in the near future. *See id.* at 54. L.C. also attends play therapy.

*See id.* The Children's respective foster and kinship parents testified that they were doing well in their homes, which their CASA corroborated. *See id.* at 39, 53, 77.

To the extent that Mother argues in her third issue that the juvenile court abused its discretion by directing CYF to file a petition for involuntary termination of her parental rights, there is no such directive in the subject order. Relatedly, the court determined that the Children had been in placement for fifteen of the last twenty-two months, as mandated by Section 6351(f). This determination required the court to decide whether CYF has documented "a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare" of the Children. 42 Pa.C.S.A. § 6351(f)(9)(ii). The court found that CYF did not have a documented compelling reason. *See* Permanency Review Orders, 7/7/25, at 3-4. Ms. Michael testified that CYF did not have a compelling reason and had been internally discussing moving forward with an involuntary termination petition. *See* N.T., 7/7/25, at 67. She stated that she believed it was in the Children's best interests to pursue permanency through adoption. *See id.*

The above record evidence clearly establishes that a goal change to adoption was in the best interests of the Children.[7] Therefore, we discern no error of law or abuse of discretion in the court's decision to change the Children's permanency goals from reunification to adoption. Therefore, Mother's first, second, and third issues merit no relief.

Mother's fourth and fifth issues concern the court's continued suspension of visitation and contact between her and the Children. *See* Mother's Brief at 22-25, 29-30. As these issues are essentially identical, we address them together. Collectively, Mother contends that the court's suspension of visitation was an abuse of discretion because there was "never any evidence of trauma" previously suffered by the Children or that the visits would be "harmful" to them. *Id.* at 22-24. We are not persuaded by Mother's arguments.

Initially, the court explained that it is "self-evident" that the Children suffered trauma as a result of Mother's severe abuse and neglect and that "a formal finding of trauma" is not required. Juvenile Court Opinion, 7/7/25, at 9-10.

Indeed, Pennsylvania case precedent requires a finding of "grave threat" for a court to deny visitation between parents and dependent children when

---

[7] We note that the evidence discussed below regarding Mother's remaining issues also supports that a goal change was in the best interests of the Children.

the placement goal is reunification. ***In the Interest of L.V.***, 127 A.3d 831, 840-41 (Pa. Super. 2015) (explaining that the "grave threat standard is met when the evidence clearly shows that a parent is unfit to associate with his or her children; the parent can then be denied the right to see them."). The court made this finding in the Children's adjudication and disposition orders and suspended Mother's visits. ***See*** Orders of Adjudication and Disposition, 4/16/24, at 7. Mother did not appeal. In addition, Mother did not appeal from the two subsequent permanency review orders that continued the visitation suspension.

Nevertheless, the record verifies that, fifteen months into the Children's dependencies, it was not in the Children's best interests to reintroduce contact with Mother at that time.[8] ***See*** N.T., 7/7/25, at 18, 20-21, 23-27, 41; ***see also*** Status Review Order (L.C.), 4/15/25, at 3. Ms. Kearse, Mother's family therapist at Catholic Charities, testified that the professionals involved had not yet made a definitive determination that contact with Mother would be appropriate for the Children. ***See*** N.T., 7/7/25, at 23.

Ms. Kearse testified that she conducted several observations of the Children in their respective placements, school, and summer camp. ***See id.*** at 18, 20-21. With respect to E.C., Ms. Kearse testified that he was unable to

---

[8] This Court has stated that "when the goal is an alternative to reunification, the juvenile court may limit or deny visitation as long as the reduction satisfies the best interest of the child." ***In the Interest of L.T.***, 158 A.3d 1266, 1283 (Pa. Super. 2017).

- 15 -

express his emotions, and, therefore, she opined that reinitiating contact with Mother at this time was inappropriate. *See id.* at 24-25, 27, 41. With respect to L.C., the record reveals that in the April of 2025 status review order, just three months prior to the subject hearing, the court found that L.C.'s kinship resource showed her a picture of Mother and she "pushed the picture away and ran into her room." Status Review Order (L.C.), 4/15/25, at 3. Further, L.C. had nightmares for the following two nights from simply looking at a picture of Mother. *See id.* Therefore, Mother's fourth and fifth issues fail, as the record clearly supports the decision of the juvenile court.

Based upon the foregoing, we discern no error of law or abuse of discretion by the juvenile court changing the Children's permanency goals to adoption. Thus, we affirm the orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 02/03/2026